IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO. 7:20-CR-00029-M-1

UNITED STATES OF AMERICA, )
)
  Plaintiff, )
)
v. )      ORDER
)
MARLON PORTER, )
)
  Defendant. )

This matter comes before the court on Marlon Porter's four pending motions to suppress.
Porter moves to suppress all evidence obtained and derived from his seizure on June 26, 2019,
DE 139; all evidence obtained and derived from his seizure and arrest on September 23, 2019,
DE 151; separately, his statements on September 23, 2019, DE 137; and all evidence obtained
from the search of his vehicle on December 13, 2019, DE 138.[1] An evidentiary hearing was held
on October 25, 2021, and the court announced it would take the matter under advisement. For the
reasons below, Porter's motions to suppress are denied except as to certain custodial statements at
the scene of his September seizure and arrest.

## I. Procedural History

Marlon Porter was indicted on February 26, 2020, along with his co-defendants Italia
Williams and Raymond Kennedy. Indictment, DE 1. Porter was charged in nine of the ten counts

---

[1] Motion to Suppress All Evidence Obtained and Derived from Seizure of Defendant on 26 June
2019 and Incorporated Memorandum of Law ("June Mot."), DE 139; Motion to Suppress
Defendant's Statements on 23 September 2019 and Incorporated Memorandum of Law
("Sep. Mot."), DE 137; Motion to Suppress All Evidence Obtained and Derived from Seizure of
Defendant on 23 September 2019 and Incorporated Memorandum of Law ("*Pro Se* Mot."),
DE 151; and Motion to Suppress All Evidence Obtained from Search of Gold Jeep Commander
on 13 December 2019 and Incorporated Memorandum of Law ("Dec. Mot."), DE 138.

1

of that indictment with various drug and firearms offenses. *See id.* at 1–6. Count One charges a drug trafficking conspiracy "[b]eginning in or about December 2018 . . . and continuing up to and including on or about December 13, 2019." *Id.* at 1. All but one of Porter's other charges stem from encounters that are the subjects of his motions to suppress. *See id.* at 1–6 (charging, in Count Three, the knowing and intentional distribution of heroin "[o]n or about July 16, 2019").

Porter was arrested on March 5, 2020, DE 25, and had his initial appearance before Magistrate Judge Jones the next day, DE 12. Porter was ordered detained pending trial by Judge Jones after waiving his right to a detention hearing. DE 45; DE 46. After granting several continuances of his arraignment, the court accepted Porter's plea of not guilty as to all charges. DE 163; *see also* DE 60; DE 67; DE 72; DE 122; DE 129.

Porter filed three motions to suppress on June 11, 2021. June Mot.; Sep. Mot; Dec. Mot. The government responded to these motions. Govt. Resp. Opp'n, DE 153. The court granted Porter leave to file a reply as to his motion to suppress the evidence obtained from the December search. Reply Supp. Dec. Mot., DE 160. Porter filed a *pro se* motion to suppress all evidence obtained and derived from his September 23, 2019 seizure on July 1, 2021. *Pro Se* Mot. The court initially denied this *pro se* motion because Porter was represented by counsel but reinstated it by oral order on September 1, 2021. DE 163. The government responded in opposition to this motion as well. Govt. Resp. Opp'n II, DE 164. An evidentiary hearing on all pending suppression motions occurred on October 25, 2021. DE 169.

## II.    Factual Findings

The court derives the following facts from exhibits submitted in support of Porter's motions as well as testimony and evidence presented at the evidentiary hearing, including video footage submitted to the court.[2]

### A.  June 26, 2019

1.    Corporal Garrett Norris of the Wilmington Police Department and Deputy John Koonce of the New Hanover County Sheriff's Department were working together in Wilmington on the joint Housing Task Force. Tr. 10:4–18; Tr. 35:10–36:1.

2.    At the time, Corporal Norris had been on the force for about fourteen years, Tr. 9:15–10:8, and Deputy Koonce had about a year of experience, Tr. 35:2–4.

3.    Between 10:00 and 11:00 pm, Corporal Norris and Deputy Koonce were talking to a cyclist they had stopped on the 1000 block of Ann Street. Tr. 10:19–23; Tr. 36:7–14; *see also* Ex. A 0:00–2:53 (recording portions of this conversation).[3]

4.    The officers heard several gunshots coming from the area of Gores Row and Orange Street roughly one block away. Tr. 10:19–11:3; Tr. 36:10–17; *see* Ex. A 2:53–3:10 (recording the first gunshot at 2:53 and the last audible gunshot at 3:10); *see also* Case Supplemental Report of Deputy Koonce dated July 1, 2019 at 1, DE 139-3 ("I heard multiple gunshots from what sounded like multiple shooters coming from the Gores Row area.").

---

[2] Exhibit A is body camera footage from the June 26, 2019, encounter with Porter from the perspective of Corporal Garrett Norris. Exhibit B is body camera footage from the September 23, 2019, encounter with Porter outside the hotel from the perspective of Officer Andrew Vrooman. Exhibit C is body camera footage from the September 23, 2019, encounter with Porter outside the hotel from the perspective of an unidentified officer arriving at the scene after Porter and Jones had been detained. Exhibit D is video footage from Porter's September 23, 2019, stationhouse interview.

[3] Because of the high position of Corporal Norris' body camera, few events recorded are visible in the camera's frame. *See* Tr. 30:21–31:9 (discussing this limitation).

3

5.    The officers released the cyclist, got in their marked patrol vehicle, and turned off of Ann Street headed north on 11th Street. Tr. 11:8–13; Tr. 36:17–19.

6.    Upon turning onto 11th Street, Corporal Norris "immediately . . . observed a black male running across the street" and pointed him out to Deputy Koonce. Tr. 11:14–16; Tr. 36:20–24. This person was later identified as Marlon Porter.

7.    At that time, officers did not know who was involved in the shooting. Tr. 40:13–16.

8.    Porter was "running east, away from the scene" on Orange Street. Tr. 23:5–15; *see* Tr. 26:20–24 (testifying that Porter was running "west-to-east"); *see also* Tr. 32:18–23 (explaining that the intersection of Gores Row and Orange Street is about 100 to 150 feet west of the intersection of 11th Street and Orange Street).

9.    When the officers saw Porter running, approximately fifteen seconds had elapsed since they began responding to the gunfire. *See* Tr. 15:24–16:2; Ex. A 2:53–3:14 (recording Corporal Norris heading toward the car at 3:00 and pointing out the person running at 3:14 after the last audible gunshot at 3:10).

10.    The area around Orange Street and 11th Street was illuminated with streetlights that would have allowed officers to observe any person within two to three blocks. *See* Tr. 14:19–22 (noting the absence of obstructions); Tr. 40:17–41:3 (same).

11.    Porter was the only person the officers observed in the area. Tr. 13:5–8; Tr. 45:14–16.

12.    The officers testified that in, their experience, most people involved in shootings flee the scene. Tr. 16:3–9; *see also* Tr. 40:2–12 (explaining that they do so to avoid apprehension and identification).

4

13.     The officers continued heading north on 11th Street—speeding up "to try to engage the suspect, due to all the gunshots in that area." Tr. 11:14–18.

14.     During their approach, the officers lost sight of Porter for "just a few seconds" as he ran behind a building on the southeast corner of the intersection of 11th Street and Orange Street. Tr. 22:10–25; *see also* Tr. 43:2–6 ("a second or two, at most").

15.     Porter came back into view as the officers pulled into the intersection of 11th Street and Orange Street. Tr. 23:12–15.

16.     As the officers were getting out of their vehicle, Porter turned and began running in the officers' direction from the side of the building. Tr. 23:16–25; Tr. 36:25–37:2.

17.     The officers drew their service weapons and ordered Porter to "get on the ground" as Porter shouted, "they're shooting at us." Tr. 26:1–8; 37:2–7; *see also* Ex. A 3:22–30 (showing, briefly, Porter in the frame as he complies with commands to "get down on the ground").

18.     Both officers testified that the area around 11th Street and Orange Street was a high-crime area known for gun violence. *See* Tr. 16:10–14 ("high-crime area for narcotics and gun incidents"); Tr. 37:19–39:4 (recounting familiarity with the area based on dozens of arrests as well as its reputation for gang activity and having "a lot of shootings").

19.     While detaining Porter, Deputy Koonce observed another person—later identified as Porter's brother George—"rummaging around" in a vehicle about fifteen feet from the officers' position. Tr. 44:1–4.

20.     Deputy Koonce testified that George Porter had not come or gone from the intersection and must have been in the car when they arrived. Tr. 47:1–16.

21.     While Corporal Norris remained with Porter, Deputy Koonce detained George Porter. Tr. 44:1–9.

5

22.     After the officers detained Porter and his brother, other people arrived at the scene. *See* Tr. 45:1–14 (testifying that it is not uncommon for people to come out to see what is going on after a shooting); Tr. 27:8–15 (explaining that "some people started walking up to our general area" but were not detained because this "was after the fact"); *see also* Ex. A 3:34–4:46 (showing at least two other people come into view after the officers detained Porter).

23.     After another officer arrived to assist with Porter, Corporal Norris checked the area behind the building where the officers had lost sight of Porter and found a handgun lying in the grass. Tr. 12:18–22; Tr. 14:3–8.

24.     Both Porter and his brother were arrested and transported to the Wilmington Police Department stationhouse. *See* Reporting Officer Narrative of Corporal Norris at 1–2, DE 139-2 (describing Porter's post-arrest conduct).

### B. September 23, 2019

#### 1. Encounter Outside the Hotel

25.     At around 5:30 a.m. Corporal Brendan McInerny, Officer Andrew Vrooman, and other officers of the Wilmington Police Department responded to a call reporting men sleeping in a car parked outside a hotel. Tr. 51:2–11.

26.     Corporal McInerny had been with the police department for about thirteen years. *See* Tr. 50:4–23 (noting his three-and-a-half years with the Narcotics Enforcement Unit and around nine years in Uniform Patrol as well as his completion of several narcotics enforcement schools).

27.     Officer Vrooman was a trainee assigned to Corporal McInerny. Tr. 51:5–7.

28.     When Corporal McInerny and Officer Vrooman arrived, Porter and another person—later identified as Johnnie Jones—"appeared to be passed out" inside the vehicle with the driver's side door ajar. *See* Tr. 51:11–19 (noting that another officer had arrived before them); Ex. B 0:35–50.

29.     Porter was in the driver's seat with his head laid back and shoes off while Jones was curled up in a fetal position in the passenger's seat. Tr. 52:15–20; Ex. B 0:50–1:15.

30.     Corporal McInerny testified that the officers needed to "figure out what was going on" because it was "very common for people to do drugs or drink" in these sorts of cases. Tr. 52:6–12.

31.     Corporal McInerny stood in front of the driver's side door and instructed Officer Vrooman to wake Porter. Tr. 52:24–53:1; Ex. B 1:24–30 (showing Officer Vrooman rouse Porter and step back from the vehicle as Porter got out of the driver's seat).

32.     Porter stated that, after waking up, he "exited the vehicle on [his] own" and was engaged in a "consensual encounter." Tr. 75:13–1; *see also* Tr. 52:24–53:1 ("As Mr. Porter was woken up by Officer Vrooman and he stood up out of the seat on his own . . . .").

33.     As Porter stood, Corporal McInerny observed "by his right leg, between his right leg and the console, what appeared to be a large Saran wrap ball." Tr. 52:24–53:3.

34.     Corporal McInerny testified that, based on his training and experience, the Saran-wrapped ball "looked like it would be narcotics." Tr. 53:3–5.

35.     Because of this, Corporal McInerny instructed Porter to step away from the vehicle. Tr. 53:6–8; Ex. B 1:40–42.

36.     Corporal McInerny repeated this command, which was echoed by Officer Vrooman. Ex. B 1:42–52.

37.     Porter refused and Corporal McInerny told him that Officer Vrooman would pull him away from the vehicle if he did not comply. Tr. 53:8–9; Ex. B 1:52–55.

38.     Porter tried to reenter the vehicle but was pulled away and, eventually, subdued by Officer Vrooman and another officer after a brief struggle. Tr. 53:9–11; Ex. B 1:55–2:15.

7

39.     Corporal McInerny testified that he saw Porter grab at the Saran-wrapped ball on the seat. Tr. 53:10–11.

40.     Officer Vrooman testified that, when he grabbed Porter and removed him from the vehicle, he had not yet seen what Corporal McInerny had observed in the vehicle. Tr. 74: 12–18.

41.     Because of this, he "was not sure if [the item Corporal McInerny had seen] was some form of illegal narcotics or if it was a weapon." *Id.*

42.     He stated that he grabbed Porter after he disobeyed the officers' commands and "tried to lunge in[to the vehicle] for that item." *See id.* (explaining that he did so because "at the time it felt like the safety for myself and the other officers involved, [Porter] needed to be detained.")

43.     Multiple officers held Porter down on the pavement and instructed him not to move as they placed him in handcuffs. Ex. B 2:17–32.

44.     After being placed in handcuffs, Porter told the officers "I ain't grabbing no f—g drugs" and Corporal McInerny replied, "You were grabbing something, where's that bag you were grabbing for?" Ex. B 2:34–49.

45.     Officer Vrooman asked if Porter had anything sharp before frisking him. Ex. B 3:49–4:02.

46.     Officer Vrooman also took down Porter's name and date of birth. Ex. B 6:15–47.

47.     After placing Porter in handcuffs, the officers asked him several questions about what they would find in the car, his activities that morning, why he was outside the hotel, and his criminal history. *See, e.g.,* Ex. C 4:09–6:50 (recording these exchanges).

48.     Later, an officer challenged Porter about his knowledge of the drugs found in the vehicle. Ex. C 13:35–14:00.

8

49. At no point during the encounter did these officers read Porter his *Miranda* rights. Tr. 66:1–6.

### 2. *Stationhouse Interview*

50. Shortly after 8:00 am, Officer Lawson interviewed Porter for approximately forty minutes in a stationhouse interview room. *See* Ex. D 0:22–40:05.

51. At the start of the interview, Officer Lawson read Porter his *Miranda* rights, *see* Ex. D 2:08–2:35 (including advising that "anything that [he said] can and will be used against [him] in court"), and Porter signed a waiver form before answering questions, Ex. D 2:40–3:10.

52. Early in the interview, Porter made statements about drug possession, distribution, and use. *See* Ex. D 4:30–4:50 (admitting that some of the drugs officers had recovered from the vehicle that morning were his); Ex. D 7:48–8:20 (discussing, in general terms, the volume of his drug sales and what drugs he used).

53. Porter also told Officer Lawson that he had "smoked a blunt" before his arrest outside the hotel earlier that morning. Ex. D 5:30–6:00

54. Roughly nine minutes into the interview, Officer Lawson and Porter engaged in the following exchange about cooperation:

> Lawson: So what are we gonna do about these drug charges, man? Right now, you're out on bond for firearm-by-felon from the June charge, there's another gun in the car, you're saying it ain't yours. You know—I don't know—so what are we gonna do about the drugs in the car? Who—is there somebody—who are you getting it from?
>
> Porter: Can that help me?
>
> Lawson: Absolutely.
>
> Porter: I mean what kind of guarantee can I get if I testify—I mean, you know what I'm saying?
>
> Lawson: Well I can't guarantee you anything. That's not my—that's not my job. My job isn't to guarantee—that's gonna be the U.S. Attorney's Office.

9

Ex. D 9:18–10:00.

55.     Porter mentioned that he did not have a bond and offered to cooperate to be released. Ex. D 10:5–15.

56.     Officer Lawson recounted Porter's current situation and asked, "What can you give me that's gonna let me make a phone call to the U.S. Attorney to let something like that happen?" Ex. D 10:16–30.

57.     Porter then discussed his drug trafficking activities, *see* Ex. D 10:30–13:20, and made statements about his conduct on June 23, 2019, *see* Ex. D 13:20–14:18.

58.     Officer Lawson testified that Porter was charged with possession with intent to sell and deliver cocaine—rather than trafficking—because of his cooperation. Tr. 90:19–91:10; *see also* 100:5–12 (testifying that he believes this was a "concession due to [Porter's] cooperation").

59.     Officer Lawson also testified that Porter was released on bond on those charges, Tr. 91:11–13, after he informed the magistrate setting the conditions of release of Porter's cooperation, *see* Tr. 100:21–101:8 (agreeing that this was standard practice).

### C. December 13, 2019

60.     Officers with the Wilmington Police Department and New Hanover County Sheriff's Office planned to search a residence in Wilmington as part of an ongoing drug investigation. *See* Tr. 106:1–107:8.

61.     After observing drug sales, officers stopped a vehicle leaving the residence, found keys to a room at a nearby hotel, and conducted a *Mirandized* interview of Raymond Kennedy. Tr. 107:12–18.

62.     Kennedy stated that Porter was in the hotel room with drugs and a firearm. Tr. 107:19–21.

63.     Another law enforcement source had informed FBI task force officer William Campbell that Porter and Kennedy were engaged in narcotics sales from that hotel. Tr. 109:16–24.

64.     Officers surveilling the hotel observed a gold Jeep parked underneath the exterior-facing door of the hotel room in question. *See* Tr. 108:17–25 (noting that this Jeep was one of perhaps seven vehicles in a lot with about 200 spaces and was the only vehicle parked near this room).

65.     Detective Woodin testified that during "the week prior" to these events, Detective St. Pierre told him that Porter had recently been robbed, was carrying a firearm to protect himself, and had been observed "driving around in a gold Jeep Commander" with a Louisiana license plate. Tr. 109:1–10; *see also* Tr. 111:15–21 (explaining that Detective St. Pierre was a previous partner from a high-crime task force who commonly shared information when it appeared that they were "both looking in the same area").

66.     Detective Woodin was familiar with Porter from previous drug investigations. *See* Tr. 111:22–112:5.

67.     During the threat assessment for the execution of the search warrant, officers discovered that Porter was a felon. Tr. 112:6–13.

68.     Detective Woodin testified that knowing Porter was an armed felon "led [officers] to expedite [the search] so that he wouldn't be a harm to society." Tr. 112:13–16.

69.     He estimated that three or four hours elapsed between officers observing the vehicle leaving the residence that morning and executing the search warrant at the hotel. *See* Tr. 107:21–108:6 (agreeing that "things were moving at a very fast pace").

11

70. Detective Woodin's warrant application identified the hotel room and a "[g]old Jeep Commander with a Louisiana registration, 311DCE" as places to be searched. Application for Search Warrant at 3–4, DE 138-1.

71. In support of this application, Detective Woodin averred that "it is common for persons involved in the illegal drug trade to commonly keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences, businesses, motor vehicles, or like localities." Application for Search Warrant at 6.

72. He also averred that "it is common for persons involved in the illegal drug trade often [sic] keep hand guns, ammunition, and other weapons in their residence, business[,] and automobiles to safeguard supplies of drugs and the fruits of drug dealing." *Id.*

73. Detective Woodin agreed with defense counsel's characterization of these "boilerplate" averments as "general language that's used in drug warrants." Tr. 115:3–14.

74. His application also included more specific information, such as the tip Detective Campbell had received about drug sales from a room rented in Kennedy's name, a statement by the buyer in a drug transaction observed earlier that morning that he had bought heroin from Kennedy at this hotel room the day before, Kennedy's statement about that there was more heroin in this hotel room, and the officers' recovery of a room key to that hotel from Kennedy. Application for Search Warrant at 7.

75. Detective Woodin also averred that, based on his training and experience, "it is common for drug traffickers to keep/store illegal narcotics in hotel rooms." *Id.*

76. The application contained no facts about Porter or the gold Jeep Commander. Tr. 115:22–116:2.

12

77.     Detective Woodin testified that this omission "was a very clear lapse" and that the information he had about Porter and the vehicle "should have been included." *See* Tr. 118:15-119:3 (explaining that he had information that the vehicle was involved and that Porter was at the location); *see also* Tr. 119:9–11 (explaining that the information he had about the vehicle's involvement was why it was included as a place to be searched).

78.     Detective Woodin attributed this error to his relative inexperience with narcotics investigations at the time. Tr. 119: 3–4 ("I was a six-month detective with a supervisor that had no narcotics experience."); *see also* Tr. 119:5–7 (acknowledging what he has learned since then about the need for more thorough documentation).

79.     The search warrant was issued at 1:36 pm and executed at 2:26 pm. Return of Service, DE 138-1.

80.     Detective Woodin was present for the execution of the warrant. Tr. 116:3–5.

81.     Officers found keys to the gold Jeep Commander with Porter in the hotel room. *See* Tr. 111:4–10.

82.     Officers recovered four bags of heroin, a 9mm handgun, and a digital scale from the vehicle. Case Supplemental Report of Detective Woodin dated Feb. 11, 2020 ¶ 11, DE 138-4.

### III.     Analysis

#### A. Officers had reasonable suspicion to stop Porter on June 26, 2019.

Porter contends that officers lacked reasonable suspicion when they seized him. June Mot. at 5. Thus, he seeks to suppress his presence at the scene and all evidence obtained and derived from his seizure. *Id.* at 3. The government notes that his seizure occurred in a high-crime area at night, and Porter was the only person these officers observed running away from the intersection where they had heard gunfire roughly fifteen seconds earlier. Tr. 130:6–19. The government

13

maintains that these circumstances provided officers with reasonable suspicion to seize Porter. Govt. Resp. Opp'n at 5–6.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The court must first determine "at what point in [an] encounter the Fourth Amendment becomes relevant." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). For Fourth Amendment purposes, the "'seizure' of a 'person' . . . can take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *Terry*, 392 U.S. at 19 n.16). "Generally speaking, a 'seizure' warranting protection of the Fourth Amendment occurs when, in view of the totality of the circumstances surrounding the 'stop,' a reasonable person would not feel free to leave or otherwise terminate the encounter." *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002) (citing *United States v. Sullivan*, 138 F.3d 126, 133 (4th Cir. 1998)).

"The protection against unreasonable seizures includes brief investigatory stops," often called *Terry* stops. *United States v. Drakeford*, 992 F.3d 255, 262 (4th Cir. 2021) (quoting *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc)). If a person is seized, "and the police then discover evidence, the court must assess whether reasonable suspicion or probable cause supported the seizure." *United States v. Stover*, 808 F.3d 991, 996 (4th Cir. 2015) (citing *Terry*, 392 U.S. at 20–21). "The Government bears the burden of proving that reasonable suspicion justified a warrantless seizure." *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020) (quoting *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018)). This reasonable suspicion standard is "'a less demanding standard than probable cause' but requires 'at least a minimal level

14

of objective justification for making the stop.'" *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

To justify a *Terry* stop, "[an] officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Drakeford*, 992 F.3d at 262 (quoting *Terry*, 392 U.S. at 21). Courts should consider the totality of the circumstances. *Id.* (quoting *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016)). "The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Mitchell*, 963 F.3d at 390 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). This determination "must give due weight to 'commonsense judgments and inferences about human behavior' made by officers in light of their experience and training." *Id.* (quoting *Wardlow*, 528 U.S. at 125). "Facts innocent in themselves may together amount to reasonable suspicion; officers are permitted to conduct investigative stops 'based on what they view as suspicious—albeit even legal—activity.'" *Id.* (quoting *United States v. Perkins*, 363 F.3d 317, 326 (4th Cir. 2004)). While an "inchoate and unparticularized suspicion or hunch" will not suffice, *id.* (citing *Wardlow*, 528 U.S. at 124), the court must "credit[ ] the practical experience of officers who observe on a daily basis what transpires on the street," *id.* (quoting *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993)).

The circumstances of Porter's seizure closely track those held to establish reasonable suspicion in *United States v. Moore*, 817 F.2d 1105 (4th Cir. 1987). As summarized by the Fourth Circuit in *Foster*, the *Moore* court:

> [C]onclud[ed] that there was reasonable suspicion for a *Terry* stop where (1) a police officer responded quickly to a silent burglar alarm in a high-crime area at

15

night, (2) the officer saw only the defendant in the area, (3) the defendant was "about 30 to 40 yards" from the building in question, and (4) "[the defendant] was moving away from the scene of the crime, though the silent nature of the alarm may have given him no cause to hurry[.]

824 F.3d at 95 (citing 817 F.2d at 1106–07).  Similar circumstances exist here supporting Corporal Norris' and Deputy Koonce's decision to seize Porter.

First, these officers encountered Porter within fifteen seconds of hearing several gunshots roughly one block away. *See* Tr. 15:24–16:2.  Compared with the justified seizure in *Moore*, these officers arrived in a fraction of the time, *see* 817 F.2d at 1107 (noting that "two or three minutes" had elapsed since the silent alarm call), with more reason to believe that at least one armed person had committed a felony, *cf. id.* at 1107, 1108 (explaining that "[t]he burglar alarm provided a reasonable basis for believing that a burglary had occurred" and that the suspected burglary was a "felony that often involves the use of weapons").  This encounter with Porter also occurred between 10:00 and 11:00 p.m. in a neighborhood these officers knew from experience to be a high-crime area prone to gun violence. *See* Tr. 16:10–14; Tr. 37:19–39:4. While not themselves sufficient to support a stop, "the high-crime reputation of an area and the late hour of a police encounter can contribute to a finding of reasonable suspicion." *Foster*, 824 F.3d at 92.

Second, Porter was the only person these officers saw in the area when they seized him. *See* Tr. 13:5–8; 45:14–16.  Not until *after* Porter was detained did the officers observe his brother "rummaging around" in a vehicle parked nearby, Tr. 44:1–4, and other people began arriving at the scene, *see* Tr. 45:1–4; 27:8–15; *see also* Ex. A. 3:27–3:35 (showing, briefly, Porter complying with orders to get on the ground before another person comes into view).  Moreover, these officers reasonably believed that multiple shooters may have been on the loose.  *See* Case Supplemental Report of Deputy Koonce dated July 1, 2019 at 1 ("I heard multiple gunshots from what sounded like multiple shooters . . . .").

16

Third, these officers observed Porter "running . . . away from the scene." Tr. 23:5–10. Based on their training and experience, they knew it to be common for those involved in shootings to flee the scene to avoid apprehension or identification. Tr. 16:3–9; Tr. 40:2–12. Possible innocent explanations for Porter's flight from gunfire do not negate these officers' reasonable suspicions, *see Foster*, 824 F.3d at 94 (quoting *Moore*, 817 F.2d at 1107) (discounting possible innocent explanations for Foster's movements because "it must be rare indeed that an officer observes behavior consistent only with guilt and incapable of any innocent interpretation."), nor does the fact that Porter did not flee from the officers, *see Moore*, 817 F.2d at 1107 (citing *United States v. Price*, 599 F.2d 494, 502 (2d Cir. 1979)) (rejecting, for the same reasons, the argument that reasonable suspicion could not exist where Moore did not flee the officer and behaved as any resident of the area might have). Finally, as in *Moore*, the officers seized Porter about 100 to 150 feet from the scene of the suspected crime. *See id.* at 1106 (noting the seizure occurred within 30 to 40 yards of the scene of the suspected burglary); Tr. 32:18–23.

Porter's contentions to the contrary are unavailing. He challenges reasonable suspicion based on this combination of facts by emphasizing the absence of *other* facts. While *Foster* required additional suspicious behavior to justify a nighttime *Terry* stop in a high-crime area, the Fourth Circuit reached this conclusion by distinguishing—rather than overruling—*Moore*. *See* 824 F.3d at 95 (citing 817 F.2d at 1106–07) ("[W]e found reasonable suspicion under similar circumstances in *United States v. Moore*, though in that case a police officer was responding to a burglar alarm rather than an anonymous 911 call."). Unlike *Foster*, the officers here had no need to corroborate an anonymous tip reporting gunshots because they had heard them mere seconds earlier. *Cf. id.* at 95–96 (citing *United States v. Sims*, 296 F.3d 284, 287 (4th Cir. 2002)) (discussing what was needed to "bolster" the anonymous caller's report of a gunshot in the area).

17

Similarly, these officers did not need to observe behavior consistent with possession of firearms to particularize their suspicions on the only person they observed running from the scene where gunshots had been heard. *Cf. id.* at 87, 96 (quoting *Sims*, 296 F.3d at 287) (noting that Foster's "security check" gave officers "reason 'to suspect that [Foster] was the man of whom [they] had been warned'" after encountering him "just standing there, looking around").

Porter's reliance on *United States v. Curry* is also legally and factually misplaced. *See* June Mot. at 7 (quoting 965 F.3d at 326) ("Allowing officers to bypass the individualized suspicion requirement based on the information they had here—the sound of gunfire and the general location where it may have originated—would completely cripple a fundamental Fourth Amendment protection and create a dangerous precedent."). *Curry* did not address reasonable suspicion and, instead, considered only an exigent circumstances justification not advanced here. *Compare* 965 F.3d at 318 (noting that the government had abandoned the *Terry* issue by conceding that the stop was suspicionless), *with* Govt. Resp. Opp'n at 6 (arguing that the application of the exigent circumstances exception is unnecessary because Porter's seizure was a justified *Terry* stop); *see also United States v. Whitehead*, No. 5:19-CR-323-FL-1, 2021 WL 354465, at *5 n.2 (E.D.N.C. Feb. 2, 2021) ("Here, the government is not relying on the exigent circumstances exception, rendering the Fourth Circuit's opinion in *Curry* of limited import."). Further, the officers in *Curry* did not seize the only person they saw fleeing the scene but came upon "several people standing near the apartment buildings" where gunshots had been heard and "five to eight men" milling about in a nearby field. *See United States v. Curry,* No. 3:17CR130, 2018 WL 1384298, at *2 (E.D. Va. Mar. 19, 2018) (noting that the officers fanned out and approached different individuals); *see also id.* at *11 (emphasizing that the officer who seized Curry "candidly admitted that, not

18

only did he have no particularized suspicion as to Curry, but he was not attempting to detain only Curry.").

Considering the totality of the circumstances, Corporal Norris and Deputy Koonce had reasonable suspicion to believe that Porter was engaged in criminal activity when they seized him. Thus, Porter's motion to suppress his presence at the scene and all evidence obtained and derived from his seizure is denied.

### B. September 23, 2019

#### 1. Officers had reasonable suspicion to seize Porter when he tried to reenter the vehicle and probable cause to arrest him after they discovered narcotics.

Porter challenges the officers' reasonable suspicion for detaining him when he tried to reenter his vehicle. *See generally Pro Se* Mot. He argues that he tried to terminate a "consensual encounter" with officers conducting a welfare check and that the large Saran-wrapped ball Corporal McInerny observed did not justify his seizure. *See* Tr. 75:13–76:2. The government contends that Porter's seizure was justified after officers saw what they suspected, based on their training and experience, to be narcotics. *See* Govt. Resp. Opp'n II at 1, 4.

"A police officer may elevate a police-citizen encounter into an investigatory detention only if the officer has a 'reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" *United States v. Cox*, No. 20-4224, 2021 WL 2843183, at *2 (4th Cir. July 8, 2021) (quoting *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000)). Once a person submits to the officers' authority and evidence is recovered, the court must assess whether the seizure was justified when it was made. *Strover*, 808 F.3d at 996 (citing *Terry*, 392 U.S. at 20–21). The same principles regarding seizure and reasonable suspicion set out above apply to this encounter as well.

No one disputes that Porter was seized, *see* Ex. B 1:40–2:30, but the precise timing of his seizure is less obvious, *see Stover*, 808 F.3d at 996 (citing LaFave, 4 Search & Seizure § 9.4(d))

19

("lower courts will frequently be confronted with difficult questions concerning precisely when the requisite physical seizure or submission to authority . . . occurs."). By Porter's own account, he had not been seized when Corporal McInerny observed the large, Saran-wrapped ball near his leg. *See* Tr. 75:13–19 (stating that he "exited the vehicle on [his] own" and was engaged in a "consensual encounter" which he "could terminate or move about freely as [he] [saw] fit because [he] hadn't been detained"); Tr. 52:24–53:5 (testifying that he observed this item when Porter stood up out of the vehicle). He had not yet been seized by a "show of authority" when he refused to comply with the officers' commands to step away and lunged back into the vehicle. *Strover*, 808 F.3d at 996 (citing *Brendlin v. California*, 551 U.S. 249, 254 (2007)) ("'[W]ithout actual submission' to the police, 'there is at most an attempted seizure,' which is not subject to Fourth Amendment protection."). Porter was seized, however, when Officer Vrooman and Officer Cooke dragged him from the vehicle and placed him in handcuffs. *See id.* at 998 (citing *California v. Hodari D.*, 499 U.S. 621, 623, 629 (1991)) (explaining that in "the seminal Supreme Court decision on submission," a defendant who tossed contraband during his flight from officers had not submitted—and was therefore not seized—until he was tackled). Thus, the issue is whether the officers had "reasonable articulable suspicion . . . that criminal activity may be afoot" when Porter tried to reenter the vehicle. *Cox*, 2021 WL 2843183, at \*2 (quoting *Burton*, 228 F.3d at 527).

In *United States v. Turner*, the Fourth Circuit held that an officer had reasonable suspicion to order occupants to exit the vehicle based on behavior his training and experience caused him to suspect was associated with illegal drug use. *See* 933 F.2d 240, 242, 244 (4th Cir. 1991) (describing the behaviors that justified this brief investigatory detention). As they exited, the officer observed white powder and drug paraphernalia in plain view between the seats, which justified the arrest of the suspect and search of the vehicle. *Id.* at 244. Here, Corporal McInerny

20

suspected, based on his training and experience, that the large Saran-wrapped ball he saw near Porter's leg contained narcotics. Tr. 52:24–53:5. Though not controlling, the North Carolina Court of Appeals has upheld a seizure where the officer acted on the same suspicion about Saran-wrapped packages. *See State v. Castellon*, 151 N.C. App. 675, 683, 566 S.E.2d 696, 701 (2002) (upholding the seizure of a concealed Saran-wrapped package when officers "recognized immediately that they contained contraband" because they knew from their training and experience that narcotics are "commonly packaged with [S]aran wrap"). The court finds this reasoning persuasive and credits Corporal McInerny's commonsense judgment about the Saran-wrapped ball he observed in plain view. *See Mitchell*, 963 F.3d at 390 (citing *Lender*, 985 F.2d at 154) (instructing that the reasonable articulable suspicion determination give due weight to officers' commonsense judgments based on their training and practical experience).

The officers here had reasonable suspicion to seize Porter. Based on the preceding analysis, Corporal McInerny acted with reasonable suspicion when he attempted to seize Porter by a show of authority. *See* Ex. B 1:42–55 (ordering a noncompliant Porter to step away from the vehicle). Although Officer Vrooman had not yet observed the suspected contraband, *see* Tr. 74:12–18 (noting that he knew Corporal McInerny had seen something he had not), the collective knowledge doctrine authorized him to effectuate Corporal McInerny's orders, Ex. B 1:53–55 (recording Corporal McInerny's warning that Officer Vrooman would remove Porter from the vehicle if he did not comply with commands to step away); *United States v. Massenburg*, 654 F.3d 480, 492–93 (4th Cir. 2011) (summarizing precedent permitting officers to carry out searches or arrests when acting on the information or instructions of other officers because the instructing officer's knowledge is imputed to the acting officer). Moreover, when he conducted the seizure, Officer Vrooman had seen Porter "lunge for" this unknown item. *See*

21

Tr. 74:12–18 (explaining that he felt Porter needed to be seized because the item may have been a weapon or narcotics). Thus, Porter's *pro se* motion to suppress is denied.[4]

### 2. Certain of Porter's unwarned statements in response to officers' questioning at the scene of his seizure and arrest will be suppressed.

Porter contends that his statements in the hotel parking lot should be suppressed because they were made during a custodial interrogation without *Miranda* warnings. Sep. Mot. at 5. The government does not dispute that Porter was in custody and that he was not advised of his *Miranda* rights but maintains that the public safety exception applies to his questioning. *See* Govt. Resp. Opp'n at 7.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This right attaches whenever a suspect undergoes a "custodial interrogation." *United States v. Bell*, 901 F.3d 455, 462 (4th Cir. 2018) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). A person is "in custody" for the purposes of *Miranda* when his "freedom of action is curtailed to a 'degree associated with formal arrest.'" *See United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010) (quoting *Berkemer v.*

---

[4] Porter cites a non-binding Virginia Supreme Court decision addressing what inferences officers can draw from materials that can be used for legitimate purposes. *See Pro Se* Mot. at 5–6 (citing *Buhrman v. Commonwealth*, 275 Va. 501, 506 (2008)). *Buhrman* held that "probable cause cannot be established 'solely on the observation of material which can be used for legitimate purposes, even though the experience of an officer indicates that such material is often used for illegitimate purposes.' Rather, 'such observations must be combined with some other circumstance indicating [the suspected] criminal activity.'" *See* 275 Va. at 506–07 (citing *Brown v. Commonwealth*, 270 Va. 414, 419 (2005)) (internal citations omitted) (concluding that an officer's observation of a hand-rolled cigarette by an apparently intoxicated suspect did not establish probable cause). Without opining on the persuasiveness of this holding, the court notes that it does not appear applicable to a seizure that was effectuated after Porter had been ordered to step away from the vehicle and "tried to lunge in for [the item in question]." *See id.* at 507 (citing *Hollis v. Commonwealth*, 216 Va. 874, 877 (1976)) (distinguishing the instant case from one in which "the defendant took furtive actions to hide hand-rolled cigarettes from the police" because this conduct "could support a reasonable belief in criminal activity"); Tr. 74: 12–18.

*McCarty*, 468 U.S. 420, 440 (1984)) (instructing that this question asks whether a reasonable person would have understood his situation to be one of custody under the totality of the circumstances). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) *that the police should know are reasonably likely to elicit an incriminating response from the suspect.*" *Bell*, 901 F.3d at 462–63 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)) (instructing that courts should make this determination from the perspective of the suspect but can consider the intent of the police as well).

Generally, any statement made during a custodial interrogation will be suppressed unless police have advised the suspect of his *Miranda* rights. *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012). That said, courts have recognized certain limited exceptions to the *Miranda* rule. One such exception exists for "routine booking questions for securing 'biographical data.'" *United States v. D'Anjou*, 16 F.3d 604, 609 (4th Cir. 1994) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion)) (providing that such questioning may not be meant to elicit incriminating responses); *see also Bell*, 901 F.3d at 462–63 (quoting *Innis*, 446 U.S. at 301) (excepting words and actions "normally attendant to arrest and custody" from "interrogation). A "public safety exception" permits officers to ask questions before issuing *Miranda* warnings but "only where there is 'an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon.'" *United States v. Mobley,* 40 F.3d 688, 693 (4th Cir. 1994) (quoting *New York v. Quarles*, 467 U.S. 649, 659 n.8 (1984)).

The public safety exception requires a fact-specific inquiry into the circumstances of a given case, but "[a]s an exception, it must be construed narrowly." *Id.* at 693, 693 n.2; *see also United States v. Lloyd*, 581 F. App'x 203, 204 (4th Cir. 2014) (quoting *Quarles*, 467 U.S. at 658)

23

("The exception . . . will be circumscribed by the exigency which justifies it."). The Fourth Circuit refused to apply the public safety exception to "an ordinary and routine arrest scenario" when the government did not prove "an immediate need" to ask an arrested suspect "if there was anything in the apartment and specifically any weapons that were in the apartment that could be of danger to the agents" conducting the search. *See Mobley*, 40 F.3d at 691, 693 (noting that officers had conducted a "security sweep" confirming that the defendant was the only person in the apartment). *Mobley* rejected arguments by the government that "approache[d] a *per se* position as to questioning people on narcotics charges" and cautioned that "[a]bsent other information, a suspicion that weapons are present in a particular setting is not enough . . . to demonstrate an objectively reasonable concern for immediate danger to [the] police or public." *Id.* at 693 n.2. In an unpublished opinion, the Fourth Circuit has affirmed the applicability of the public safety exception to an officer asking a handcuffed suspect if he had "any sharp objects, knives, needles, or guns" before frisking him. *See United States v. Young*, 58 F. App'x 980, 981–82 (4th Cir. 2003) (focusing on the admissibility of the defendant's response about a gun).

The officers here conducted a custodial interrogation. Porter was in custody for the purposes of *Miranda* when he was being held against the pavement by officers placing him in handcuffs. *See* Ex. B 2:17–30 (showing multiple officers holding Porter down and instructing him not to move as he was being placed in handcuffs); *Hargrove*, 625 F.3d at 178 (citing *Berkemer*, 468 U.S. at 440) (treating as sufficient the curtailment of the suspect's freedom of action to a "degree associated with formal arrest"). After this point, officers directed several questions and comments to Porter that the court finds fall within the scope of "interrogation." See, *e.g.*, Ex. B 2:34–39 (asking what he was grabbing at in the vehicle after Porter denied that it was drugs); Ex. C 4:09–6:50 (asking questions about the vehicle's contents, Porter's activities outside the hotel, and

24

criminal history); Ex. C 13:35–14:00 (challenging Porter about his possession of drugs). At no point during this encounter did officers administer *Miranda* warnings. Tr. 66:1–6.

Unless they fall within an exclusion from or exception to the *Miranda* rule, Porter's custodial statements are subject to suppression. *See Holmes*, 670 F.3d at 591 (citing *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997)). Officer Vrooman's questions about Porter's name and date of birth, Ex. B 6:15–47, fall within carveouts for routine booking activities, *D'Anjou*, 16 F.3d at 609 (quoting *Muniz*, 496 U.S. at 601); *see also Bell*, 901 F.3d at 462–63 (quoting *Innis*, 446 U.S. at 301). Likewise, Officer Vrooman's question about sharp objects before frisking Porter, Ex. B 3:49–4:02, is covered by the public safety exception, *Young*, 58 F. App'x at 981–82. The government has not, however, demonstrated an "immediate need" separating the rest of the officers' questions from the "ordinary and routine arrest scenario." *See Mobley*, 40 F.3d at 693.

The government's contention that *United States v. Cox* provides for pre-*Miranda* questioning where drugs are discovered, *see* Govt. Resp. Opp'n at 7 (citing 955 F.2d 42 (4th Cir. 1992) (unpublished)), approaches the "*per se* position as to the questioning of people in custody on narcotics charges" rejected in *Mobley*, 40 F.3d at 693 n.2. Although the *Miranda* issue had not been preserved for review and the admission of the defendant's response would have been harmless error, *Cox* stated that "[o]nce the officers discovered the drug paraphernalia, it was reasonable for them to inquire about Cox's drug use since drug users often act irrationally." 1992 WL 29136, at *4 (citing *Quarles*, 467 U.S. at 649) (noting that the officer had asked someone he had stopped if he was a heroin user, purportedly "for [the officer's] own concern and safety"). The court assigns no weight to this unpublished dicta.[5]

---

[5] No other court has relied on *Cox* for its statements related to the public safety exception. *See United States v. Smith*, No. 2:13CR46, 2014 WL 51255, at *4 (N.D.W. Va. Jan. 7, 2014), *report and recommendation adopted*, No. 2:13-CR-46, 2014 WL 346889 (N.D.W. Va. Jan. 30, 2014)

While this encounter occurred in a public place, the officers had secured Porter and Jones, as well as the vehicle. The possibility that Porter might have known about drugs or weapons somewhere else does not justify departing from *Miranda's* general rule. *See Mobley*, 40 F.3d at 693 n.2 ("Absent other information, a suspicion that weapons are present in a particular setting is not enough, as a general matter, to demonstrate an objectively reasonable concern for immediate danger to [the] police or public."). Thus, aside from the exceptions noted above, Porter's motion to suppress is granted as to all his statements outside the hotel after he was handcuffed.

### 3. Porter's statements during his stationhouse interview with Agent Lawson were voluntary.

Porter's *Mirandized* statements after asking about the benefits of cooperation cannot be rendered involuntary based on any specific promise of leniency. The parties disagree over the import of Porter's question whether discussing his drug trafficking activities "can" help him and Officer Lawson's response "absolutely." Ex. D 9:18–45. Porter claims that he reasonably perceived Officer Lawson's response as a specific assurance that his statements *would* help him. *See* Sep. Mot. at 8–9 (arguing that their use at trial would render them involuntary). The government contends that no promises were made to Porter and that, even if one could be inferred, it would be insufficient to overcome his will. Govt. Resp. Opp'n at 9.

A statement is involuntary under the Fifth Amendment's Due Process Clause if the "the defendant's will has been overborne or his capacity for self-determination critically impaired" by coercive government conduct. *United States v. Umana*, 750 F.3d 320, 345 (4th Cir. 2014) (quoting

---

(citing Jim Weller, Comment, *The Legacy of* Quarles*: A Summary of the Public Safety Exception to Miranda in the Federal Courts*, 49 BAYLOR L. REV. 1107 (1997)) (noting that the only citations to *Cox* on the issue of *Miranda* were two law review articles, one of which criticized it as "possibly the least plausible source of danger yet contemplated in a *Quarles* setting" and "stated that the court's reasons [sic] 'extends the public safety exception too far.'").

Case 7:20-cr-00029-M   Document 187   Filed 01/18/22   Page 26 of 40

*United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc)). This determination considers "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987)). The government bears the burden of proving by a preponderance of the evidence that Porter's statements were voluntary. *United States v. Giddins*, 858 F.3d 870, 881 (4th Cir. 2017) (citing *Braxton*, 112 F.3d at 781). Although a *Miranda* warning "does not . . . dispense with the voluntariness inquiry[,] . . . '[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'" *United States v. Walker*, 607 F. App'x 247, 255 (4th Cir. 2015) (unpublished) (quoting *Dickerson v. United States*, 530 U.S. 428, 444 (2000)).

As an initial matter, nothing about the circumstances of Porter's interview suggest coercion. He was interviewed in a clean and well-lit room for roughly forty minutes after being awakened between two and three hours earlier. *See generally* Ex. D 0:22–40:05. He received *Miranda* warnings, Ex. D 2:08–35, and signed a waiver form before answering Officer Lawson's questions, Ex. D 2:40–3:10.[6] No evidence suggests Officer Lawson used threats or violence. Tellingly, Porter does not seek to suppress any of the inculpatory statements he made to Officer Lawson before their discussion about cooperation. *See* Sep. Mot. at 9 ("Porter's statements to Officer Lawson after the exchange starting at 9:20 of the recording should be suppressed."); Ex. D

---

[6] Although Porter had given unwarned statements to arresting officers about three hours earlier, there is no suggestion that this subsequent *Mirandized* interview was deliberately employed as part of a calculated effort to undermine *Miranda* such that Justice Kennedy's narrower test from *Missouri v. Seibert*, 542 U.S. 600 (2004), would apply. *See United States v. Mashburn*, 406 F.3d 303, 308–309 (4th Cir. 2005) (citing *Seibert*, 124 S. Ct. at 2612) (discussing the tests applicable to two-stage interrogations; *see also* Sep. Mot. at 7 (citing *Braxton*, 112 F.3d at 781) (arguing that Porter's statements were involuntary under the same standard from *Braxton* set out above).

4:30–4:50 (admitting that some of the drugs recovered from the vehicle were his); Ex. D 7:48–8:20 (discussing his drug sales and personal use).

During his cross-examination of Officer Lawson, defense counsel briefly addressed Porter's possible intoxication during this interview. *See* Tr. 96:7–16 (asking if Porter appeared to be "under the influence of drugs" and noting that Porter appears to "doze[] off" later in the interview); *see also* Ex. D 25:45–26:00 (showing Officer Lawson say Porter's name and repeat his question after Porter did not immediately respond). While Porter told Officer Lawson that he had "smoked a blunt" sometime during the night before, Ex. D 5:30–6:00, the video recording of the interview shows him giving detailed answers to Officer Lawson's questions and raising several of his own. Such responsiveness establishes that his statements are not rendered inadmissible by any degree of residual intoxication he may have experienced that morning. *See, e.g.*, *Boggs v. Bair*, 892 F.2d 1193, 1198–99 (4th Cir. 1989) (concluding that a defendant's confession was admissible when he "smelled of alcoholic beverages" and had bloodshot eyes but gave detailed oral and written responses to officers' questions roughly two hours after hitting a pedestrian with his car).

Moving to Porter's argument about Officer Lawson's alleged assurances, Fourth Circuit precedent leaves him with little room to argue that these post-*Miranda* representations render his subsequent statements involuntary. *See United States v. Santiful*, 701 F. App'x 242, 244 n.1 (4th Cir. 2017) (unpublished) (citing *United States v. Mashburn*, 406 F.3d 303, 309–10 (4th Cir. 2005)) ("Discussions about cooperation during a custodial interrogation have generally been approved by [the Fourth Circuit]."). Porter cites earlier statements from the Supreme Court suggesting that a statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the extension of any improper influence." Sep. Mot. at 7 (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976)). But "[d]espite this broad

28

language," later Fourth Circuit cases recognize that "government agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary." *Shears*, 762 F.2d at 401 (citing *Hutto*, 429 U.S. at 30). Still, statements following such discussions can be rendered involuntary if they were made in exchange for specific promises of leniency that are subsequently broken. *Mashburn*, 406 F.3d at 309 (*Shears*, 762 F.2d at 402, 402 n.5)

Porter's motion thus turns on whether he reasonably inferred a "specific promise of leniency" that—if broken—would render his later statements involuntary. His argument has three components—two backward-looking and one forward-looking. Porter contends that he reasonably inferred a promise and that he made statements based on the nature of this promise. Looking prospectively, he maintains that the government's use of these statements against him would breach this promise, rendering his statements involuntary. For the reasons discussed below, the court rejects these conclusions.

First, Porter could not have reasonably inferred any promise. His question "can that help me," Ex. D 9:42–44, asked whether cooperation *could* help him, *see Can, Merriam-Webster*, unabridged, https://unabridged.merriam-webster.com/unabridged/Can (last accessed Jan. 10, 2022) ("to be able to do, make, or accomplish"); *Can, Oxford Dictionaries*, https://premium.oxforddictionaries.com/definition/american_english/can (last accessed Jan. 10, 2022) ("Have the opportunity or possibility to"). In that sense, Officer Lawson's response merely conveyed that cooperation "is looked upon favorably by prosecutors and judges"—a notion the Fourth Circuit has recognized as a near-"truism." *United States v. Leonard*, 141 F.3d 1161, 1998 WL 163735, at *5 (4th Cir. 1998) (unpublished table decision) (quoting *United States v. Baldwin*,

60 F.3d 363, 365-66 (7th Cir.1995), *vacated on other grounds*, 517 U.S. 1231 (1996), *on remand*, No. 94-1025, 1997 WL 471328 (7th Cir. Aug. 14, 1997)).

Moreover, Officer Lawson told Porter "I can't guarantee you anything" when Porter sought assurances before cooperating. *See* Ex. D 9:47–55 (suggesting that any guarantee would by up to the U.S. Attorney's Office). While "discussions possibly amounting to promises of leniency or a plea bargain must be viewed from the defendant's . . . perspective," *see Shears*, 762 F.2d at 402 n.5 (citing *Grades v. Boles*, 398 F.2d 409, 412 (4th Cir. 1968)), courts have consistently rejected arguments that defendants perceived implicit promises when their claims were belied by officers' refusals to offer guarantees, *see, e.g.*, *Pelton*, 835 F.2d at 1073 (refusing to credit the defendant's "claim that he believed the agents promised leniency" where, among other reasons, "[t]he record [was] clear . . . that agents consistently refused to give any guarantees"); *United States v. Cooper*, 98 F. Supp. 2d 721, 727 (E.D. Va. 2000), *aff'd*, 15 F. App'x 115 (4th Cir. 2001) (rejecting the defendant's argument that detectives' statements about the effect of cooperation "were designed to . . . extract statements from him as a result of promises of leniency" where "the detectives . . . consistently refused to give any guarantees and specifically informed the defendant that they were 'not gonna make promises.'"); *see also Shears*, 762 F.2d at 402–03 (rejecting the defendant's argument that he perceived promises about pleading to a lesser charge where it was undisputed that agents did not make any promises in their discussion of potential cooperation). Thus, Officer Lawson's explicit disclaimer disabused Porter of any "reasonable perception" that he had received a promise. *Cf. Shears*, 762 F.2d at 402 n.5 (citing *Boles*, 398 F.2d at 412) (explaining the importance of the "defendant's perception of what government agents have promised" by reference to cases in which that perception was "reasonable").

Second, even if Porter *could* have reasonably perceived some implied promise from Officer Lawson's responses,[7] no evidence suggests it would be of a sort that could render his statements involuntary if broken. *See Mashburn*, 406 F.3d at 309–10 (citing *Shears*, 762 F.2d at 402, 402 n.5); *see also Shears*, 762 F.2d at 402, 402 n.4 (suggesting that agents "may even be able to make and breach certain promises without rendering a resulting confession involuntary"). Assuming, arguendo, that Officer Lawson promised Porter his cooperation *would* "help" him, the Fourth Circuit has refused to find statements involuntary when they were used against defendants who received similarly unqualified assurances. *See, e.g.*, *United States v. Whitfield*, 695 F.3d 288, 303 n.8 (4th Cir. 2012)) (refusing to do so where the officers assured the suspect that he "would do 'nothing but help[] [himself]'" by talking to them); *Umana*, 750 F.3d at 344–45 (refusing to do so when the government introduced statements at sentencing that the defendant made after officers assured him that discussing crimes in other jurisdictions "doesn't cost you anything" and would not "affect the case here at all").

Porter relies on *Pelton's* implication that "specific promises of leniency" would suffice, *see* Sep. Mot. at 7 (citing 835 F.2d at 1073) (stating that these are "far different" from "[g]eneral encouragement to cooperate"), but few such promises have been identified, *see* Tr. 124:18–21 (identifying the Fourth Circuit's 1968 decision in *Boles* as the most recent example). Dicta in *Shears* notes that a broken promise about "pleading to a lesser charge" could "possibly vitiate the voluntariness of [the] defendant's statement." *See* 762 F.2d at 403 (concluding that the defendant's testimony "completely negate[d] the making of any implied promises on this subject."). This

---

[7] Porter contends that Officer Lawson "did not tell Porter that there are no guarantees, but instead said that was not his job, it was the job of the US Attorney['s] Office." Sep. Mot. at 8; *see also* Tr. 97:24–98:4 ("Q. When Mr. Porter then asks about a guarantee, we've seen what you said in response, essentially saying 'That's not my job, that's up to the U.S. Attorney's Office,' correct? A. Yes, sir."); Ex. D 9:50–10:00.

Case 7:20-cr-00029-M   Document 187   Filed 01/18/22   Page 31 of 40

suggestion appears to overlap with *Shears'* recasting of *Boles*. *See id.* at 402 n.5 (citing 398 U.S. at 412) ("We also held that the defendant's reasonable perception that he had been promised that all charges on unrelated offenses would be dropped, a perceived promise that was not fulfilled, was the principal and determinative factor leading to his confession, which was therefore involuntary.").[8]  Porter's interview contains no exchanges effectively amounting to plea bargaining.  Instead, the only "specific" form of "leniency" discussed was the possibility of Porter's release on a bond.  Ex. D 10:05–30; *see also Shears*, 762 F.2d at 402, 402 n.4 (citing *United States v. Ferrara*, 377 F.2d 16, 17–18 (2d Cir. 1967)) (using the Second Circuit's refusal to suppress statements made after an agent commented that he "felt sure [the defendant] would get out on reduced bail" if he cooperated to explain that officers "may even be able to make and breach certain promises without rendering a resulting confession involuntary").

Finally, no "promise" Porter could have inferred about his cooperation would be broken by the use of his statements against him.  Porter contends that his statements "have not helped him," Sep. Mot. at 8, but Officer Lawson's uncontroverted testimony refutes that notion.  Not only did Porter receive the specific form of leniency he asked about, *see* Tr. 100:21–101:8 (discussing Porter's release on a bond after Officer Lawson informed the magistrate of his cooperation), he

---

[8] The main issue in *Boles* was not whether prosecutors obtained a confession in violation of the defendant's Fifth Amendment rights by breaking their promises but the conditions under which the defendant agreed to these promises.  The court refused "to condone [] a species of plea bargaining shorn of any of the essential safeguards mandated for true plea bargaining."  *See Boles*, 398 F.2d at 413 (describing as "wholly unacceptable" conditions under which the confession was ultimately extracted when the defendant had been interrogated for over sixteen hours without being advised of his right to counsel).  *Miranda* did not apply per se to the defendant's interrogation because his trial occurred in 1959, but the court still considered the lack of counsel as a relevant factor.  *Id.* at 410 n.2 (citing *Davis v. State of North Carolina*, 384 U.S. 737 (1966)).  *Boles* addressed the defendant's reasonable perception of the prosecutors' comments because the state claimed that no promise had been made or that any promise had "only an attenuated causal connection with the confession." *Id.* at 412.

32

also was charged with a lesser drug offense, *see* Tr. 100:5–12 (expressing his belief that this was a "concession due to [Porter's] cooperation"). While dicta in *Umana* suggests that breaking "an outright promise that nothing [the defendant] said would ever be used against him" could render statements involuntary, 750 F.3d at 345, Porter cannot establish this sort of sweeping and categorical guarantee, *see* Ex. D 2:08–35 (recording Officer Lawson's *Miranda* warning that "anything [Porter said] can and will be used against [him] in court"). Any use of Porter's statements against him would, at most, show that Officer Lawson "highlight[ed] the positive aspects of confession." *See Umana*, 750 F.3d at 344 (citing *Whitfield*, 695 F.3d 302–03 n.8) (explaining that the Fourth Circuit has "consistently declined to hold categorically that a suspect's statements are involuntary" on this basis).

In sum, viewing this discussion from Porter's perspective, he could not have reasonably inferred a "specific promise of leniency" whose breach could render his statements involuntary. Thus, Porter's motion to suppress his statements following this exchange is denied.

### C. December 13, 2019

Porter contends that the search warrant lacks probable cause as to the gold Jeep Commander because the application did not establish a nexus between himself, the vehicle, and criminal activity. Dec. Mot. at 4. He also claims that this absence of facts renders *Leon's* good faith exception inapplicable. Dec. Mot. at 6–8 (citing *United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996)). The government maintains that the warrant was supported by probable cause because it identified the gold Jeep Commander as a place to be searched and included averments that people involved in drug trafficking commonly keep firearms and drugs in vehicles. Tr. 132:14–133:20 (citing *United States v. Anderson*, 851 F.2d 727 (4th Cir. 1988)). Alternatively, the government contends that the *Leon* good faith exception applies based on information known

33

to Detective Woodin connecting that Jeep to Porter and his criminal activity. *See* Tr. 133:20–134:12 (citing *United States v. Leon*, 468 U.S. 897 (1984)). In this case, the court exercises its judicial discretion to proceed directly to consideration of the *Leon* good faith exception. *See, e.g., United States v. Doyle*, 650 F.3d 460, 466 n.8 (4th Cir. 2011) (quoting *United States v. Clutchette*, 24 F.3d 577, 581 n.4 (4th Cir. 1994) (citing *Leon*, 468 U.S. at 925)) ("[R]eviewing courts have the discretion to consider the questions of the officers' good faith without deciding the Fourth Amendment issue."); *United States v. Andrews*, 577 F.3d 231, 235 (4th Cir. 2009) (citing *Leon*, 468 U.S. at 925) ("As did the district court, we exercise our discretion to forego discussing the validity of the search warrant and proceed directly to the question of whether the district court properly refused to suppress the evidence seized in the search based on the officers' good faith reliance on the warrant.")

The Fourth Amendment generally requires that officers secure a warrant before conducting a search. *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). These search warrants must be supported by probable cause, which requires that "'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in belief that contraband or evidence will be found' in the place to be searched." *Id.* (quoting *Ornelas*, 517 U.S. at 696). "Generally, evidence seized in violation of the Fourth Amendment is subject to suppression under the exclusionary rule," *Andrews*, 577 F.3d at 235 (citing *United States v. Calandra*, 414 U.S. 338, 347–48 (1974)), but *Leon* "modified the exclusionary rule to allow the use of evidence 'obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause,'" *see id.* at 235–36 (citing 468 U.S. at 900) (explaining that the exclusionary rule's deterrence objective would not be achieved by suppression in this context).

A warrant issued by a magistrate is typically sufficient to establish good faith on the part of an officer conducting the search, but "the Supreme Court identified four circumstances in which an officer's reliance on a search warrant would not be 'objectively reasonable'":

> (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth";
>
> (2) "where the issuing magistrate wholly abandoned his judicial role" as a detached and neutral decisionmaker;
>
> (3) where the officer's affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and
>
> (4) where "a warrant [is] so facially deficient ... that the executing officers cannot reasonably presume it to be valid."

*Id.* at 236 (citing *Leon*, 468 U.S. at 922–23) (internal citations omitted). Therefore, the "mere insufficiency of the affidavit to support probable cause will not preclude the application of the *Leon* good faith exception." *Doyle*, 650 F.3d at 470 (citing *Andrews*, 577 F.3d at 236 n.1). Instead, suppression of evidence obtained pursuant to a search warrant is appropriate only where "a reasonably well trained officer would have known the search was illegal despite the magistrate's authorization." *Andrews*, 577 F.3d at 236 (quoting *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002)).

This objective inquiry considers "all of the circumstances," including "specific, uncontroverted facts known to the officer[]" that were "inadvertently omitted from the warrant application." *See United States v. Thomas*, 908 F.3d 68, 73 (2018) (quoting *United States v. McKenzie-Gude*, 671 F.3d 452, 459–61 (4th Cir. 2011)) (explaining that these facts "necessarily inform the objective reasonableness of an officer's determination regarding probable cause"). Suppression of evidence "obtained pursuant to a warrant supported by the affidavit of an officer, who, in fact possesses probable cause" would be "anomalous," *id.* at 73 (quoting *McKenzie-Gude*, 671 F.3d at 460), because negligent nondisclosure "is not the kind of deliberate misconduct that

35

the exclusionary was intended to deter," *id.* at 74 (citing *Herring v. United States*, 555 U.S. 135, 144 (2009)) (contrasting such mistakes with "systemic error or reckless disregard of constitutional requirements"). Indeed, officers have little incentive to deliberately withhold information tending to establish probable cause from a search warrant application. *Id.* at 74 n.3.

Detective Woodin's inadvertent omissions present the same issues as *McKenzie-Gude* considered, and the same result is appropriate here. In *McKenzie-Gude*, the warrant application identified a residential address as the place to be searched. 671 F.3d at 456. The supporting affidavit described with particularity certain suspects' criminal activities and also included generalized averments that evidence of these crimes would be found at the residence. *Id.* at 456–57. The affiant officers' submission to the magistrate did not, however, include any of the information they knew tying these people and their criminal activity to the place to be searched. *See id.* at 457–58 (noting the absence of this "requisite nexus"). The government argued that the officers executing the search acted with objective reasonableness based on "additional evidence" showing that they had "good quality information linking the criminal activity, the defendant, and the target evidence." *See id.* at 459 (explaining the uncontroverted information establishing that the officers knew the defendant lived at the place to be searched). The Fourth Circuit acknowledged that suppression remained appropriate where officers "rely on 'an affidavit so lacking in indicia of probable cause as to render official belief in its existence objectively unreasonable,'" *id.* (citing 468 U.S. at 923), but rejected the defendant's attempt to limit *Leon*'s good faith inquiry to the four corners of the officers' affidavits, *see id.* (citing 468 U.S. at 922 n.23) (emphasizing that this inquiry was to be made "in light of '*all of the circumstances*'" known to the officers). Given the uncontroverted facts known to the affiant officers when they executed the search, *McKenzie-Gude* concluded that they would have had "no reason to second guess the

magistrate's imprimatur of their application" and acted in an objectively reasonable manner. *See id.* at 460–61 (refusing to apply the exclusionary rule when these officers "merely failed to recognize their own inadvertent omission").

Similarly, the "additional evidence" known to Detective Woodin established the "requisite nexus" between the criminal activity, Porter, and the gold Jeep Commander. His application identified the hotel room and the gold Jeep Commander as places to be searched. Application for Search Warrant at 3–4. The supporting affidavit described with particularity the drug trafficking activities of Porter's co-conspirator, *id.* at 7; established a connection between these activities and the hotel room to be searched, *id.*; and included generalized averments about the propensity of drug traffickers to keep firearms, drugs, and other evidence connected to their crimes in vehicles, *id.* at 6. The supporting affidavit did not, however, include any of the uncontroverted facts known to Detective Woodin connecting Porter and the gold Jeep Commander identified in his application to these activities. Tr. 115:22–116:2.

First, Detective Woodin had "good quality information" linking Porter to the criminal activity and the hotel room to be searched. Earlier that week, he had received a tip that Porter and the co-conspirator listed in the affidavit had been selling drugs out of this Wilmington hotel. Tr. 109:16–24. On the day Detective Woodin applied for the search warrant, officers had corroborated this tip when they arrested the co-conspirator, recovered from him a room key to this hotel, and obtained his *Mirandized* statement that Porter was in the hotel room with drugs and a firearm. Tr. 107:19–21.

Second, Detective Woodin also had ample information connecting the gold Jeep Commander listed in the application to Porter and this criminal activity. He had been advised by a former partner that Porter was driving around Wilmington in a gold Jeep Commander with

Louisiana license plates. Tr. 109:1–10. Earlier that day, officers surveilling the hotel observed a gold Jeep Commander parked directly below the room the co-conspirator had said Porter was in with drugs and a firearm. *See* Tr. 108:17–25 (noting that this was one of perhaps seven cars in the parking lot and the only one parked under that room). Moreover, Detective Woodin and the other officers executing the search found the keys to the gold Jeep Commander with Porter in the hotel room before searching that vehicle. Tr. 111:4–10; *see also* Tr. 116:3–5 (describing his involvement in the execution of the search warrant).

Nothing before the court suggests that an exception to *Leon* applies. Relying on earlier decisions, Porter raises similar arguments to those considered in *McKenzie-Gude* about the affidavit being "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See* 671 F.3d at 459 (citing *Leon*, 468 U.S. at 923) (acknowledging this exception to *Leon*); Dec. Mot. at 6–8 (citing *Wilhelm*, 80 F.3d at 121) (arguing that this exception to *Leon* applies). That said, Porter does not challenge Detective Woodin's testimony about any of this "additional evidence." *See Thomas*, 908 F.3d at 73 (quoting *McKenzie-Gude*, 671 F.3d at 460) (including in the circumstances to be considered in the *Leon* good faith exception inquiry "specific, uncontroverted facts known to the officer"). Likewise, Porter does not contend—nor does the evidence suggest—that the nondisclosure of these facts was part of a "deliberate or bad faith effort to mislead a magistrate." *See id.* (citing *Leon*, 468 U.S. at 914 n.12, 923) (noting that "'knowing or reckless falsity' in a search warrant affidavit may preclude reliance on *Leon*"). Instead, Detective Woodin's uncontroverted testimony suggests a "simple miscalculation . . . as to how much of what he knew he needed to include in his affidavit to show probable cause." *See id.* at 74–75 (citing *Herring*, 555 U.S. at 144) (distinguishing this from the deliberate misconduct the exclusionary rule is intended to deter). Specifically, these omissions appear attributable to

inexperienced investigators, *see* Tr. 119:3–7, reacting to a rapidly evolving situation on a compressed timeline, *see* Tr. 107:2–108:6 (noting that the search warrant was executed within four hours of learning that Porter was a felon who was in the hotel room with drugs and a firearm).

In sum, this case does not call for the application of the exclusionary rule. Considering the uncontroverted facts known to him but inadvertently omitted from his supporting affidavit, the court finds that Detective Woodin acted with an objectively reasonable belief that his search of the gold Jeep Commander pursuant to the warrant was supported by probable cause. As Detective Woodin recognized at the hearing, this "additional evidence" should have been documented. Tr. 118:15–119:11; *see also Anderson*, 851 F.2d at 730 n.1 (stressing the importance of carefully prepared warrant applications to the rights secured by the Fourth Amendment, despite *Leon*'s good faith exception). Nevertheless, there is no suggestion of deliberate or systemic misconduct that would support the suppression of evidence obtained under a warrant by an officer who, in fact, possessed probable cause. Thus, Porter's motion to suppress the evidence obtained from the gold Jeep Commander is denied.

## IV. Conclusion

For the reasons discussed above, Defendant's Motion to Suppress All Evidence Obtained and Derived from Seizure of Defendant on 26 June 2019 and Incorporated Memorandum of Law [DE 139] is DENIED; Defendant's Motion to Suppress All Evidence Obtained and Derived From Seizure of Defendant on 23 September 2019 and Incorporated Memorandum of Law [DE 151] is DENIED; Defendant's Motion to Suppress Defendant's Statements on 23 September 2019 and Incorporated Memorandum of Law [DE 137] is GRANTED IN PART AND DENIED IN PART; and Defendant's Motion to Suppress All Evidence Obtained from Search of Gold Jeep Commander on 13 December 2019 and Incorporated Memorandum of Law [DE 138] is DENIED.

SO ORDERED this _18th_ day of January, 2022.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

40